DAWKINS, J.
Plaintiffs seek to annul a certain contract giving defendant the exclusive right to manufacture and sell a certain patented bit and parts used" for drilling oil and gas wells, upon the following alleged grounds, to wit:
First. That said contract was obtained through fraud.
' Second. That it was void because not authorized by the corporation.
Third. For failure of the defendant to perform its stipulations.
Fourth. That the contract amounted to a transfer of all the corporate assets, and prevented it from fulfilling the purposes for which it was organized, which could only be done by proper meeting of the stockholders.
Defendant denied the alleged fraud, claimed the validity of the contract, and averred that he had more than fulfilled his obligations thereunder.
Exceptions of no cause and no right of action were pleaded as to plaintiffs Howard R. Hughes and G. W. Hardy, individually and as trustees, which exceptions do not appear to have been passed on. A nonsuit was entered on the part of “Mr. Hudson” (we presume meaning Humason, as no one by the name of Hudson appears in the petition), and upon the merits there was judgment for defendant.
Plaintiffs have appealed.
Opinion.
We will consider the question of fraud, consisting of certain alleged representations by defendant with regard to a drill bit which he was already manufacturing, together with that of the authority for the contract, for the reason that the facts touching the two propositions are so’interwoven that they can hardly be separated.
Before the trial defendant took a rule on plaintiffs to produce the records and minute book of the Oaddo Rock Drill Bit Company (hereinafter called, for convenience, the Cad-do Company), and the answer was that the plaintiffs did not have said records, and they could not be found. Hence it became a question of proving by parol what happened at the director’s meeting in which the contract with defendant was authorized, as well as the extent of the discussions and representations of the latter. It is well established that the Caddo Company, notwithstanding it had been organized for some years, had never been able to accomplish anything substantial with the patents which it controlled, and was, at the time, involved in a contest before the United States Patent Office .concerning these same patents. Dr. G. W. Robinson, of Shreveport, had furnished most of the funds spent in promoting the proposition, and, on the occasion of the meeting of the board of directors in question, though not a director, was present and insisting that some arrangement should be made with defendant. In fact, the directors, as witnesses, say that they would have agreed to anything most that Robinson had requested. Reed’s presence in Shreveport (his home and place of business being in Houston, Tex., where he was already engaged in the manufacture of a drill bit of his own) was secured at the solicitation of the Caddo Company, some of its officers and stockholders; and we are reasonably convinced that the latter, more so than the former, were in a mood to make concessions.
*1019 At the meeting. of the board of directors ■mentioned, certain representatives of the Caddo Company were directed to go with Reed to an attorney and have the necessary agreement prepared to give Reed the exclusive right to manufacture and sell the bit and parts covered by the patents controlled •by that company, on a royalty basis of 15 per centum of the gross sales. The contract was dictated to a stenographer, the attorney, representatives of the Caddb Company, and Reed all taking part therein, but before it could be. written out Reed had to leave Shreveport. About three weeks later it was ■sent to him at his home in nouston, and he immediately took it to his attorney, who advised Reed that it would prevent him from manufacturing and -selling his own bit. An ■amendment of a few lines was prepared by the attorney, making it clear that Reed was to be permitted to manufacture and sell under his own patents, and he took the papers back to Shreveport, where all of the parties who had signfed before, consisting of the entire board of directors, accepted the amendment and signed a new copy of the contract with that change, in all other respects being the same as the first. It was then taken to Houston, where it was signed by G. A. Humason, the original patentee of the Caddo Company’s patents. ■
[1] -Vs before stated, the minutes of the director’s meeting were not produced — in fact, it is doubtful if they were recorded— and the testimony is conflicting as to just what happened. Some say that Reed was to be permitted to manufacture his own bit; others deny it; some claim Reed represented his bit to be a soft formation tool, which would not he a competitor with that of the Caddo Company, because the latter was adapted to drilling only hard rock, and here there appears some inconsistency in plaintiff's’ evidence. If there was no conflict between the' two bits, and the plaintiffs believed the alleged representations of defendant on that score, then there was no necessity for-prohibiting him from manufacturing his own tool. There is no question but that it was thoroughly understood by the plaintiff that Reed was already engaged in manufacturing his own bit — that he had a plant of some size for that purpose — and it hardly appears reasonable that he would have so bound himself to manufacture alone under the patents of plaintiff when those patents were at the time admittedly involved in contest.
The lower judge, who saw and heard all the witnesses, has resolved these issues of fact in favor of the defendant, and we find no sufficient reason to disagree with him, either as to the nature of the contract authorized, or as to the representations of defendant concerning the character of his bit.
[2] With regard to the alleged failure of Reed to perform the terms of the contract, we find that it allowed him IS months within which to begin the manufacture and sale' of the bit and parts, which period was to be increased if the litigation affecting the patents was prolonged. The Cadao Company was to furnish the means for prosecuting that litigation, but failed to do so, and it was Pushed to successful conclusion by Reed at his own expense, some portions of which-were subsequently refunded by the company. After the present differences arose, the defendant in that litigation, G. A. I-Iumason, patentee and assignor of the Caddo Company, consented to have it reopened without Reed’s permission. It so happened that the iflaintiff in those proceedings was- a company of which Howard R. Hughes, one of the plaintiffs in the present suit, was the controlling head; and he is also said to be the owner of all the stock and moving spirit in the present case. It is also significant that Humason, defendant in the patent litigation which he and the Caddo Company agreed to finance to successful termination, is now a coplaintiff *1021 with Hughes in this suit. The record shows that some time prior to the expiration of the IS months allowed by the contract defendant had made substantial preparations to manufacture and sell the Caddo Company’s bit; that he had expended considerable money to that end, and was proceeding, in good faith, to carry out his part of the agreement. Hence the attack upon that ground must also fail.
[3, 4] As to the contract being ultra vires the powers of the board of directors, the charter of the corporation shows that it was organized for the purpose of manufacturing, buying, selling, and leasing all kinds of machinery, particularly the classes used for drilling oil and gas wells. The contract in this case does not sell or transfer any of its tangible property, or prohibit it from buying or selling such machinery, but merely grants to defendant the exclusive right to manufacture and sell the bit and parts covered by the patents which plaintiff company controlled. This was to be done upon a royalty basis of 35 per cent, of the gross sales, which, instead of putting the company out of business if the undertaking proved successful, would have provided it with a revenue during the life of (he contract for distribution among its stockholders, dependent only upon the success of the patents and the volume of their manufacture and sale. It contemplated a continuation, rather than a dissolution, of the corporation, which had itself been unsuccessful, and was probably insolvent at the time. In any event, all but two small stockholders and all of the directors signed and approved the contract, and the two stockholders in question are not here complaining. In these circumstances we do not think the contract can be assailed by the litigants before the court, even if it were one ultra vires the powers of the board of directors. Cyc. vol. 10; Cook 6n Corp. § 670, and authorities in footnotes.
For the reasons assigned, the judgment appealed from is affirmed, at the cost of the appellant.